IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JULIAN HATCH dba FREEDOM FROM RELIGION, and LYNNE MITCHELL dba MATCH,<br><br>        Plaintiffs,<br><br><br><br>        vs.<br><br><br>BOULDER TOWN COUNCIL, BOULDER PLANNING COMMISSION, and JOHN DOES 1-10,<br><br>        Defendants. | ORDER AND OPINION GRANTING DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br><br>Case No. 2:01-CV-00071 PGC |

Plaintiffs Julian Hatch and Lynn Mitchell ("Plaintiffs") brought this action alleging that

Boulder Utah Town Council and Planning Commission ("Boulder") violated various of their

federal and state rights.  In March 2004, this court dismissed Plaintiffs' claims, denied Plaintiffs'

motion for summary judgment, and granted Boulder's motion for summary judgment [#73].  In

December 2006, however, the Tenth Circuit affirmed in part and reversed and remanded in part.

The Circuit directed this court to more carefully consider each of the individual claims advanced

by Plaintiffs.

Now on remand, Boulder has again moved for summary judgment on the following nine

remaining issues: the subdivision development, the licensing claims, the "exclusion" from the

library, the conveyance of a cul-de-sac, the Boulder Business Brochure, the sign ordinance

violations, the town records and hours of operation, the land-use ordinance, and the claims

regarding Boulder Excavating Company ("BEC") [#87].

For the following reasons, this court finds that none of these issues withstands Boulder's

second summary judgment motion.  First, this court finds that Ms. Mitchell's equitable relief

claim regarding the Brooks Subdivision is moot — as she no longer possesses any interest in the

property — and that Mr. Hatch's subdivision claims are precluded by his 1996 federal action.  In

addition, both Plaintiffs' subdivision claims are invalid under statute of limitations, § 1983,

takings, procedural due process, and substantive due process theories.

Second, this court concludes that neither Mr. Hatch nor Ms. Mitchell has a protected

property interest regarding their respective restaurant and beer licenses.  Accordingly, Boulder

has not violated their procedural or substantive due process rights.  At the same time, Plaintiffs

fail to show that Boulder has violated their equal protection rights, as neither plaintiff is part of a

protected class or of a class of one who has suffered intentional discrimination.

Third, this court concludes that Ms. Mitchell did not have a protectable property interest

in her position as a volunteer librarian.  As a result, Boulder has not violated her procedural or

substantive due process rights.  In addition, Ms. Mitchell fails to show that Boulder has violated

her equal protection rights because she does not belong to a protected class and has not

demonstrated any intentional, differential treatment.

Fourth, the statute of limitations bars Plaintiffs' claims regarding conveyance of the

adjacent cul-de-sac.  Specifically, because Plaintiffs knew or had reason to know of any cul-de-

sac issues by 1992, they exceeded the applicable four-year limitations period by waiting until

2

2001 to file their claims.

Fifth, Plaintiffs' claims regarding the Boulder Business Brochure are moot.  Boulder never printed the brochure; and Boulder also reimbursed Plaintiffs any money spent towards their advertisement in the brochure.

Sixth, Plaintiffs' claims regarding the sign ordinance violation are not ripe for adjudication.  This "issue" arises from a letter dated nine years ago, and Boulder has not acted to remove Plaintiffs' offending signs in the meantime.  Also, "legal limbo" does not constitute an Article III case or controversy.

Seventh, Boulder did not violate Plaintiffs' due process rights through its handling of the town records or hours of operation.  Plaintiffs only experienced a delay in obtaining a requested map.  And the town did keep regular hours at the post office, where the Town Clerk could be reached.  Thus, the burden to Boulder outweighs Plaintiffs' private interest in any alternative, mandatory schedule.

Eighth, Plaintiffs' claims regarding Boulder's land-use ordinance are moot.  Plaintiffs base their claims on Ordinance 39, which the Utah Court of Appeals has ruled invalid.  And clearly, Plaintiffs cannot base their claim on an invalid ordinance.

Finally, Plaintiffs' claims regarding BEC do not show that Plaintiffs were entitled to any protectable property interest.  Specifically, Plaintiffs fail to present any potentially admissible evidence to support any entitlement to use A Street.

This court, therefore, GRANTS Boulder's second motion for summary judgment [#87].

**BACKGROUND**

**I.  Factual History**

A long history of disputes between these parties precedes the present action.  The

complaint before this court, filed in January 2001, contains allegations of civil rights violations

related to various land-use planning practices and procedures in the town of Boulder, Utah.

### A.  Subdivision Development

Ms. Mitchell owned lots 1, 2, and 3 in the Brooks Subdivision.  In the late 1980s or early

1990s, Ms. Mitchell conveyed lot 3 to Mr. Hatch for small or insignificant consideration to assist

him in resolving a property dispute with another person.[1]  In the mid-1990s, Mr. Hatch

reconveyed the lot to Ms. Mitchell,[2] and in 1998 Ms. Mitchell sold all three lots to Mr. Hatch for

an agreed amount without payment or interest.[3]  Because Mr. Hatch had not paid in full,

however, in January 2000 Mr. Hatch wrote Ms. Mitchell a warranty deed, which she did not

record until April 12, 2002.[4]  And most recently, in October 2002, Ms. Mitchell again

reconveyed the lots to Mr. Hatch.[5]  Both Plaintiffs thus concede that, as of October 24, 2002, Ms.

Mitchell "holds no interest in the Brooks Subdivision properties."[6]

---

[1] Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 3; Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 3; Mitchell Depo. 63:3-25 (Oct. 25, 2002).

[2] Mitchell Depo. 64:1-25.

[3] Mitchell Depo. 65:12-66:7; Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 4.

[4] Mitchell Depo. 67:18-68:25 (reflecting Ms. Mitchell's sworn statement at the time of the writing of the warranty deed on January 9, 2000, not January 2002 as mentioned in Pls.' Mem. Opp'n Def.'s Second Mot. Summ J. ¶ 4).

[5] Mitchell Depo. 68:2-69:16, 79:19-82:2.

[6] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. 2.

4

The original developer quit the project, and Plaintiffs allege that Boulder failed to abide by the terms of its own subdivision ordinance in developing the subdivision or in requiring the developer to carry out the job.  The only specific allegations, however, are that the original developer did not post a performance bond or place money in escrow.[7]

Beginning in 1991, Plaintiffs attempted to develop their properties,[8] asking the town to clear and develop a platted road leading to their subdivision lots.[9]  Boulder, however, asserted the developer bore responsibility for clearing a road.[10]  In 1993 through 1994, a flooding problem and discussions regarding who should bear the cost of solving it delayed construction of a road.[11]  And other problems plagued Plaintiffs' attempt to develop the property as well: the property had no electricity, water, or phones.[12]

Eventually, though, Plaintiffs opened a road.[13]  After learning that the private water company that serviced their property did not have any hookups available, Plaintiffs obtained

---

[7] Pls.' First Am. Compl. ¶ 10.

[8] Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 12; Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 12.

[9] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 12.

[10] *Id.*

[11] Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 13;Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 13.

[12] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 15.

[13] Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 15; Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 15.

approval and drilled a well.[14]  Plaintiffs also dug a trench for power lines in an utility easement;

yet because the trench also crossed a public road, the electric company, GarKane Rural Electrical

Company, said that Plaintiffs would need to use above-ground power lines.[15]  Plaintiffs, however,

considered the above-ground power lines ugly and, as a result, hired an attorney in an attempt to

force the power company to use the utility easement to bury the lines.[16]  In November or

December 1994, Plaintiffs "gave in" and installed the above-ground power lines.[17]  Plaintiffs also

tried to get the phone company to bury the phone line in the recorded utility easement.[18]  But as

of 1996, they were still trying get a phone line to the lots.[19]

    Plaintiffs encountered further problems while attempting to secure a building permit for

the lots.  Mr. Hatch claims that, as a result of his refusal to use the town building inspector — a

neighbor and former adversary whom he alleges was not licensed[20] —  Boulder required him to

sign an affidavit agreeing to pay more than $1,000 to have a different, unlicensed inspector travel

---

[14] Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 16; Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 16.

[15] Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 17-18; Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 17-18.

[16] Tr. Case No. 2:96CV0828 Exhibit 2A at 43:13 (Apr. 5, 1999); Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 19, 20; Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 19, 20.

[17] Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 20; Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 20.

[18] Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 21-22; Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 21-22.

[19] Def.'s Mem. Supp. Def.'s Second Mot. Summ. J. ¶ 21; Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 21.

[20] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 25; Hatch Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 25; Mitchell Depo. 63-64.

from Richfield to do the inspections.[21]   According to Plaintiffs, no one else in the town was

required to sign the affidavit.[22]   At the same time, however, Plaintiffs allege that "another victim

of [Boulder's] illegal building program" complained to the Utah Division of Occupational and

Professional Licensing about Boulder's inspection program.[23]   Plaintiffs claim that this "illegal

program" prevented them from ever filing building permit applications.[24]   And although specific

dates about the "illegal program" are uncertain, testimony concerning the matter indicates that

Mr. Hatch was aware of the "illegality" of the program by October 1995 at the latest.[25]

### B.  Licensing Claims

 Plaintiffs make separate licensing claims.  Mr. Hatch asserts that Boulder violated his

civil rights by denying him a restaurant business license.[26]   And Ms. Mitchell claims that Boulder

violated her civil rights by denying her a beer license while granting beer licenses to other

applicants.[27]

### 1.  Mr. Hatch's Restaurant Business License Application

On December 3, 1997, Mr. Hatch applied for a restaurant business license for "FOOD

---

[21] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 25; Hatch Decl. Opp'n Def.'s
Second Mot. Summ. J. ¶ 25.

[22] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 25.

[23] *Id.* at ¶ 26.

[24] *Id.* at ¶¶ 23, 24.

[25] Tr. Case No. 2:96CV0828 Exh. 2A at 66-67 (Apr. 6, 1999).

[26] Opp'n Def.'s Second Mot. Summ. J. ¶¶ 33-34; *see also* Pls.' Compl. ¶¶ 12-14.

[27] Opp'n Def.'s Second Mot. Summ. J. ¶¶ 35-40; *see also* Pls.' Compl. ¶ 63.

PREPARATIONS, NEC,"[28] and on December 4, 1997 Mr. Hatch's application was discussed at the regularly scheduled town meeting.[29]  In response to this discussion and as required by the Health Department, the Town Clerk sent a December 9, 1997 letter to Mr. Hatch asking whether the food would be prepackaged or if he would prepare it himself.[30]  Although Mr. Hatch inadmissibly asserts that the town "knew" he provided prepackaged food and intended to prepare food on site,[31] the record does not provide any evidence that he responded to the Town Clerk's inquiry.[32]

### 2. Ms. Mitchell's Beer License Application

On August 24, 1995, Boulder adopted Ordinance 29A, which limited the city to two "Class A Beer Licenses."[33]  Ms. Mitchell subsequently applied for a "Class A Beer License" on January 26, 1998, and on June 12, 1998 received a letter from the Town Clerk stating that no such licenses were available because Boulder had already issued the town's two licenses.[34]

On October 8, 1998, Boulder adopted ordinance 29B, which increased the number of beer

---

[28] Hatch Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 5.

[29] Pls.' Compl. ¶ 13.

[30] Mitchell Decl. Pl.'s Second Mot. Summ. J. ¶ 5; *see also* Hatch Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 5.

[31] Opp'n Def.'s Second Mot. Summ. J. 13.

[32] *See* Mitchell Decl. Pl.'s Second Mot. Summ. J. ¶ 5.

[33] Mitchell Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 15; *see also* Exhs. to Mitchell's Decl. Opp'n Def.'s Second Mot. Summ. J. Exh. K § 12(f).

[34] Mitchell Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 17.

licenses to three.[35]  In light of Mr. Hatch's then-pending federal lawsuit, Boulder issued him the

third beer license.[36]  Ordinance 29B further stipulated that the licenses are not transferrable, but

that preference would be given to those who purchase a business operating under a current beer

license.[37]  Accordingly, in January 2000, one beer license changed hands when Cottam Oil

Company purchased a store with an existing beer license.[38]

In June 2005, Boulder also granted an additional beer license to settle a dispute over a

shared license between the Owens and Mr. Besselsmith.[39]  But despite Ms. Mitchell's multiple

applications, Boulder has not granted her a beer license.

### C.  "Exclusion" from Library

In 1996, Boulder Community Foundation incorporated as a non-profit for the purpose of

running the Boulder library.  The library was located in the town hall, staffed by volunteer

librarians, and stocked with donated books.[40]  The June 5, 1997 town meeting minutes state:

"[The chairperson] will be sending a letter to the Town Board telling the status of the library.

They will ask for more volunteers to help so they can expand their hours.  We want the building

---

[35] Mitchell Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 18; *see also* Exhs. to Mitchell's
Decl. Opp'n Def.'s Second Mot. Summ. J. Exh. P ¶ 1.

[36] Def.'s Second Mot. Summ. J. ¶¶ 37-38.

[37] Mitchell Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 18; *see also* Exhs. to Mitchell's
Decl. Opp'n Def.'s Second Mot. Summ. J. Exh. P ¶ 3.

[38] Def.'s Second Mot. Summ. J. ¶ 39.

[39] Mitchell Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 21.

[40] *Id.* at ¶¶ 6-7.

open only during regular hours when an official library representative is present."[41]

Ms. Mitchell alleges that, beginning in fall 1998, the chairperson began "excluding" her from the library on Wednesday nights, the night of various Boulder town meetings.  Ms. Mitchell also claims that Helen Lyman, now deceased, told her that Boulder had demanded that Ms. Mitchell be released from her position as a volunteer librarian.[42]

In 1999, Ms. Mitchell wrote two letters — one to Ms. Lyman and one to Boulder — in which she expressed her own view that she was being excluded from the library because she was not a member of a ward in the Church of Jesus Christ of Latter Day Saints (LDS church).  These letters, however, address no potentially admissible statements or actions by Boulder officials that would, directly or indirectly, support Ms. Mitchell's discrimination allegation.[43]

### D.  Conveyance of Adjacent Cul-de-Sac

In 1990, Mr. Hatch requested that Boulder abandon the cul-de-sac adjacent to Plaintiffs' property.[44]  Plaintiffs also asked for a quitclaim deed for the cul-de-sac, which would combine their three separate lots and help them obtain building permits.[45]  Boulder later took steps to record a resolution abandoning the disputed cul-de-sac on April 23, 1992.[46]  But on the advice of

---

[41] Exhs. to Mitchell's Decl. Opp'n Def.'s Second Mot. Summ. J. Exh. D.

[42] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. 18.

[43] Mitchell Decl. Opp'n Def.'s Second Mot. Summ. J. ¶¶ 10-12.

[44] Def.'s Second Mot. Summ. J. ¶ 30.

[45] Pls.' Compl. ¶ 62.

[46] Def.'s Second Mot. Summ. J. ¶ 31.

counsel, Boulder has not conveyed the property to Plaintiffs.[47]

### E. Boulder Business Brochure

In April 1997, Boulder began organizing a business brochure.[48]  To qualify for listing in the brochure, Boulder required that applicants (1) conduct business in the Boulder area and (2) hold a valid business license.  Applications were due by March 18, 1998,[49] and Mr. Hatch timely submitted one proposing the following description for his Freedom from Religion Gift Shop: "Part religion, part corporation, the Mormon Church dominates this desert state.  Some 70 percent of the people are Mormons.  Bumper stickers, hats, T-shirts, music, information, and much more.  We love mail orders."

He now alleges that Boulder refused to use the description, claiming it was "deceptive, political or wrong," but never provided him with the reasoning for that conclusion.[50]  Yet the listing stated his business sold beer when in fact he had no beer license at the time.  Additionally, Plaintiffs assert that Boulder made unreasonable requests — including the need for a fire inspection — to keep them from renewing their business licenses, thereby effectively excluding them from the brochure.[51]  In April 1998, however, Mr. Hatch received a letter from the State Records Committee informing him that the town was no longer pursuing the brochure.[52]  And in

---

[47] *Id.* at ¶¶ 31-32.

[48] Hatch Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 12.

[49] *Id.* at ¶ 14 (giving the March date as an extension of the original date, Jan. 15, 1998).

[50] *Id.* at ¶ 16.

[51] *Id.* at ¶¶ 12-16 .

[52] Hatch Decl. Opp'n. Def. Second Mot. Summ. J. ¶ 17.

May 1998, Boulder reimbursed him for the money he paid for listing in the brochure.[53]

### F. Sign Ordinance Violation

Plaintiffs have various business signs on their property.  On June 19, 1998, Boulder sent Plaintiffs a letter informing them that their business signs did not comply with section 2.1 of Sign Ordinance 21B, which Boulder had passed in January 1998.[54]  The letter also told Plaintiffs that they had to  file a "conforming sign" request with the Town Clerk.[55]  Plaintiffs, however, believed that their signs were "grandfathered in" and were not required to comply with the sign ordinance.[56]  Plaintiffs thus allege that passage and enforcement of the sign ordinance was part of an attempt to "ruin our property interests, drive us off our properties, and run us out of town."[57]

In September 1998, Plaintiffs received another letter informing them of their sign violation.[58]  This letter, sent by Boulder's attorney, informed Plaintiffs of their noncompliance, demanded removal of the offending signs within thirty days, and explained that Boulder reserved the right to remove the signs at Plaintiffs' expense.[59]  The letter also invited Plaintiffs to contact

---

[53] *Id.*

[54] Def.'s Second Mot. Summ. J. Exh. C; *see also* Hatch Decl. Opp'n. Def. Second Mot. Summ. J. ¶ 31.

[55] *Id.*

[56] Hatch Decl. Opp'n. Def. Second Mot. Summ. J. ¶ 31.

[57] *Id.* at ¶ 32.

[58] *Id.* at ¶ 33.

[59] Def.'s Second Mot. Summ. J. Exh. E; *see also* Hatch Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 33.

the attorney to discuss the matter.[60]  Plaintiffs claim that they phoned the attorney, and that he

told them to follow the permit requirements of the new ordinance to avoid removal of the signs.[61]

Boulder's town meeting minutes from September 17, 1998 reflect that Boulder was aware

Plaintiffs felt their signs were "grandfathered in"; the minutes state that Boulder's attorney

wanted more information.[62]  Plaintiffs allege that this entry in the minutes was written as "lies,

meant to dupe this court."[63]  To date, however, Boulder has not removed any of Plaintiffs'

signs.[64]

### G.  Town Records Requests and Hours of Operation

#### 1.  Town Records Requests

Plaintiffs raise the issue of difficulty in obtaining town records,[65] which they previously

raised in their July 12, 1999 state suit.  In the present case, Plaintiffs identify only one instance

that took place after that suit: the September 14, 1999 request for a copy of the Land Use

Ordinances and official zoning maps.[66]  This map was provided to Plaintiffs in February 2000.[67]

---

[60] Def.'s Second Mot. Summ. J. Exh. E.

[61] Hatch Decl. Opp'n Def.'s Second Mot. Summ. J. ¶ 33.

[62] *Id.* at ¶ 35.

[63] *Id.*

[64] *Id.* at ¶ 36.

[65] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 46.

[66] Def.'s Reply Second Mot. Summ. J. 9.

[67] Pls.' Compl. ¶ 57.

### 2. Hours of Operation

Plaintiffs claim that Boulder fails to maintain regular office hours and that this caused difficulties in obtaining public documents.[68]  Judith Davis, Boulder Town Clerk, is responsible for the town records and keeps these records at her home, the post office, and the fire house.[69] Ms. Davis stated that there were no regular office hours for the town hall or for other town offices, but that the post office, where she could also be reached, maintained hours from 9:00 to 1:00 Monday through Saturday.[70]

### H.  Land-Use Ordinance

In reviewing Plaintiffs' appeal, the 10th Circuit determined that a "major portion of [Plaintiffs' Land-Use Ordinance] claim is precluded by plaintiffs' prior state court action."[71]  The Circuit further concluded, "The only exception appears to involve the Town's actions in March 2000, concerning the revised LUO, which could not have been raised in the prior action."[72]

On March 8, 2000, Boulder adopted Ordinance No. 39B.[73]  On February 23, 2001, however, the Utah Court of Appeals invalidated Land Use Ordinance 39 because the map presented into evidence at trial "[did] not accurately reflect the content of the Town's zoning

---

[68] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 46.

[69] Def.'s Second Mot. Summ. J.  ¶ 48.

[70] Id.

[71] Hatch v. Boulder Town Council, 471 F.3d 1142, 1149 (10th Cir. 2006).

[72] Id.

[73] Davis Decl. Supp. Def.'s Second Mot. Summ. J. ¶ 10.

ordinance."[74]

### I. BEC

#### 1. July 14, 1999 Building Permit

Ms. Mitchell owns a half-acre lot located at 210 East 180 North, Boulder, Utah.  Her property is accessible on its south and north sides by A and B Streets, respectively.[75]  Ms. Mitchell accessed her property by a road that followed B Street, and stated that she did not believe that opening A Street was necessary for her business.[76]  On January 12, 1999, BEC, a company located on A Street, filed an application for a conditional use permit.[77]  The application included a drawing with an approximation of each structure.[78]  Although the drawing located the buildings outside of the A Street right of way, as constructed BEC's building partially obstructs the section of A Street leading to Ms. Mitchell's property.[79]

#### 2. February 2001 Business Licenses

Boulder passed a temporary land-use ordinance after the 2001 Utah Court of Appeals decision, which invalidated Boulder's prior Land Use Ordinance.[80]  Plaintiffs allege that Boulder contacted the Stouts and BEC before passing the temporary land-use ordinance and accepted

---

[74] *Hatch v. Boulder*, 2001 UT App 55, ¶14, 21 P.3d 245; *see also* Pls.' Compl. ¶ 66; Davis Decl. Supp. Def.'s Second Mot. Summ. J. ¶ 10.

[75] Davis Decl. Supp. Def.'s Second Mot. Summ. J. ¶ 10; Mitchell Depo. at 88-89.

[76] Mitchell Depo. at 89-92.

[77] Def.'s Second Mot. Summ. J. ¶ 55.

[78] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. 20.

[79] *Id.*

[80] Pls.' Compl. ¶ 67.

business licenses that were "totally inconsistent with the General Plan and only to harass plaintiffs as their neighbors."[81]  Plaintiffs concede that they have no personal knowledge that anyone from Boulder actually contacted BEC or the Stouts to encourage the applications.[82]

## II.  Procedural History

In this case, Plaintiffs set forth sixty-nine mostly narrative factual allegations.  Plaintiffs then pray for relief based on the following: 42 U.S.C. § 1983, section 7 of the Utah Constitution, the Utah Government Records Access and Management Act ("GRAMA"),[83] the Utah Open and Public Meetings Act,[84] and "Equitable Relief."[85]  Plaintiffs, however, leave it to this court to decipher which factual allegations correspond with which claims for relief.

The present suit is the second federal suit between Mr. Hatch and Boulder.  In 1996, Mr. Hatch brought a § 1983 suit over Boulder's refusal to issue him a beer license,[86] and a jury awarded him $86,000 in compensatory damages.  Many of the facts presented in that case are raised again here.[87]

Furthermore, in July 1999, Mr. Hatch and Ms. Mitchell filed a petition for review of

_____

[81] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. 21; Pls.' Compl. ¶ 67.

[82] Hatch Depo. at 140; Mitchell Depo. at 136-37.

[83] UTAH CODE ANN. §§ 63-2-101 to -909 (1998).

[84] UTAH CODE ANN. §§ 52-4-1 to -10 (1998).

[85] *See* Pls.' First Am. Verified Compl. 29-38.

[86] *See Freedom from Religion & Julian Hatch v. Town of Boulder*, No. 2:96-CV-828 (D. Utah 1996).

[87] *See, e.g.,* Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶ 12, 13, 15-22, 24, 26.

decision on conditional use permits and request for injunctive relief in Utah state court.[88]  That suit alleged that Boulder improperly granted conditional use permits to an excavation business.  The state court dismissed the case, finding that it was meritless and brought in bad faith.[89]  On appeal, the Utah Court of Appeals reversed the lower court's dismissal and no additional proceedings ensued.[90]

Plaintiffs filed the present suit in January 2001.  This court granted summary judgment to Boulder based on the doctrine of res judicata, stating that most of the factual issues underlying Mr. Hatch's federal claims were raised in his prior federal case, and that those claims either were or should have been included in the prior action.[91]  In addition, this court found that the facts in this case that arose after the filing of the complaint in the prior action should have been included in an amended complaint because they arose before the April 1999 judgment.[92]  And finally, this court found the majority of Plaintiffs' state claims to be precluded, ruling that because the facts arose prior to the resolution of the case, the claims could have and should have been raised in the prior state court action.[93]

On appeal, the grant of summary judgment was affirmed in part and reversed and remanded in part.  Regarding the federal claims, the Tenth Circuit stated that "a claim should not

---

[88] *See Julian Hatch & Lynne Mitchell, Petitioners, v. The Boulder Town Council, et al.* Civil No. 99060022 (Utah 6th Dist., 1999).

[89] *See* Order and Op. Dismissing Claims, Den. Summ. J. Pls., Granting Summ. J. Def. 4.

[90] *See id.*

[91] *See id.* at 7.

[92] *See id.*

[93] *See id.* at 9.

be precluded merely because it is based on facts that arose prior to the entry of judgment in the previous action."[94]  Instead, the Circuit explainedthat when a new federal claim arises after the filing of federal suit and before its judgment, a plaintiff "*may* seek leave to file a supplemental pleading" but is "not required to do so."[95]  However, the Circuit continued, claims must be precluded if "they arise out of the same transaction or series of connected transactions as a previous suit"[96]; accordingly, even if a plaintiff's complaint is based on new facts but is still a "part of the previous transaction" — i.e., if the claims are not "*new and independent*" — then the claims must be precluded.[97]  The new facts must be "*enough on their own* to sustain the second action."[98]  "What constitutes the same transaction or series of transactions is to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."[99]

    Regarding the state claims, the Circuit stated that "lack of identity" of some of the facts

---

[94] *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1149 (10th Cir. 2006) (citing *Mitchell v. City of Moore*, 218 F.3d 1190, 1202 (10th Cir. 2000)).

[95] *Hatch*, 471 F.3d at 1150 (quoting *Computer Assocs. Int'l, Inc. v. Altair, Inc.*, 126 F.3d 365, 369-70 (2d Cir. 1997) (emphasis added)).

[96] *Hatch*, 471 F.3d at 1151 (quoting *Yapp v. Excel Corp.*,186 F.3d 1222, 1227 (10th Cir. 1999) (internal quotations omitted)).

[97] *Hatch*, 471 F.3d at 1150 (citing *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 384 (2d Cir. 2003)).

[98] *Hatch*, 471 F.3d at 1150 (quoting *Storey*, 347 F.3d at 384 (internal quotations omitted)).

[99] *Hatch*, 471 F.3d at 1149 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24 (internal quotations omitted)).

and evidence prevents preclusion of some of the claims.[100]  Additionally, the Circuit noted, it is

not the resolution of a case but its filing that governs preclusion: causes of action based on facts

that occurred after the filing of the state action need not be included in the prior suit for claim-

preclusion purposes.[101]

Now on remand, Boulder has submitted motions to strike certain declarations by

Plaintiffs [#105 and #107] and a second motion for summary judgment [#87].  For the following

reasons, this court hereby GRANTS these motions.

## DISCUSSION

### I.  Motions to Strike Plaintiffs' Declarations

This court grants Boulder's motions to strike both Mr. Hatch's and Ms. Mitchell's

declarations.  An "entire affidavit may be disregarded if inadmissible matter is [so] interwoven or

inextricably combined with the admissible portions that it is impossible, in the practical sense, to

separate them."[102]  Applying this principle to the present case, almost every paragraph of

Plaintiffs' declarations should be stricken.  The vast majority of each declaration either lacks

foundation, is argumentative, is based on inadmissible hearsay, is overly vague, is irrelevant,

and/or is based on speculation.  And this court is not required to pick though the declarations to

find the few, if any, relevant statements that could potentially survive the motions to strike.

### II.  Second Motion for Summary Judgment

---

[100] *Hatch*, 471 F.3d at 1147.

[101] *Id.* at 1147-48.

[102] *S. Concrete Co. v. U.S. Steel Corp.*, 394 F. Supp. 362, 381 (N.D. Ga. 1975).

This court finds that none of Plaintiffs' claims survives Boulder's second motion for summary judgment.  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be rendered . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[103]  In applying this standard, the court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."[104]  Only facts affecting the suit's outcome are "material facts"; disputes over immaterial facts cannot defeat a motion for summary judgment.[105]  Additionally, an issue is only "genuine" if the nonmovant "presents facts such that a reasonable jury could find in favor of the nonmovant"; the "mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine.'"[106]

### A.  Subdivision Development[107]

Plaintiffs have failed to raise any triable claims regarding the Brooks Subdivision.  Ms.

---

[103] Fed. R. Civ. P. 56(c).

[104] *Lawmaster v. Ward*, 125 F.3d 1341, 1346 (10th Cir.1997).

[105] *Id.*(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[106] *Lawmaster*, 125 F.3d at 1347.

[107] This court has been left in the unfortunate position of guessing many of Plaintiffs' legal arguments: although Plaintiffs claim that Boulder violated a number of their constitutional rights, Plaintiffs fail to link these rights with the sixty-nine paragraphs of factual allegations.  The court is thus left to conclude which rights correspond with which allegations, a task which requires application of the same law to a number of Plaintiffs' claims.  For the sake of efficiency, the court lays out the law fully in Section II.A. of this opinion.  The following sections then contain only a synthesis of, or a relevant supplement to, that law.

Mitchell's equitable relief claim is moot, and Mr. Hatch's claims are precluded by his 1996 federal action.  In addition, both Plaintiffs' claims are invalid under the statute of limitations, § 1983, takings, procedural due process, and substantive due process theories discussed below.

### 1. Mootness

Ms. Mitchell's equitable relief claim regarding the subdivision development is moot.  For this court to have jurisdiction, the controversy before it must be live — "'exist[ing] at [all] stages of appellate . . . review, and not simply at the date the action is initiated.'"[108]  As a result, cases must be dismissed as moot when intervening events make it "impossible for the court to grant 'any effectual relief whatever' to a prevailing party."[109]  Here, then, because Ms. Mitchell no longer owns any interest in the Brooks Subdivision, it would be impossible for this court to grant her any equitable relief for either her federal or state claims regarding the development of that subdivision.

### 2. Claim Preclusion

Mr. Hatch's claims regarding the subdivision development are precluded.  "Generally, 'claim preclusion bars a party from prosecuting in a subsequent action a claim that has been fully litigated previously.'"[110]  While a plaintiff may bring new, unrelated claims to court, he may not

---

[108] *Fischbach v. New Mexico Activities Ass'n*, 38 F.3d 1159, 1160 (10th Cir. 1994) (citing *Roe v. Wade*, 410 U.S. 113, 125 (1973) (second alteration in original)).

[109] *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).

[110] *Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶ 58, 44 P.3d 663 (quoting *Culbertson v. Bd. of County Comm'rs*, 2001 UT 108, ¶ 13, 44 P.3d 642).

split claims by bringing related transactions as separate claims.[111]  Accordingly, this court must look at how the prior state and federal cases affect both the state claims and the federal claims in this case.  Previously, this court improperly grouped together various claims as a single transaction and precluded all of Plaintiffs' claims arising prior to the final judgments in the 1996 and 1999 cases.[112]  This court now reassesses those claims in light of the Tenth Circuit's guidance on remand.

### a.  Utah Claim Preclusion Law

The preclusion evaluation regarding the 1999 state court claim is governed by Utah law.[113]  Utah law bars subsequent action on claims that satisfy the following three requirements:

> First, both cases must involve the same parties or their privies.  Second, the claim that is alleged to be barred must have been presented in the first suit or must be one that could and should have been raised in the first action.  Third, the first suit must have resulted in a final judgment on the merits.[114]

The Tenth Circuit concluded that the first and third of these requirements have been satisfied.[115]

Regarding the second requirement, however, the Circuit stated that a claim could not or should not have been raised and therefore would not be precluded if there exists a "*lack of identity* between the facts and evidence underlying some of the claims raised in [a] prior state court action and those raised in [the present] action."[116]  The Circuit also stated that the legal

---

[111] *See Hatch*, 471 F.3d at 1146 (citing RESTATEMENT (SECOND) OF JUDGMENTS § 24).

[112] *Hatch*, 471 F.3d at 1144, 1148.

[113] *Id.* at 1146.

[114] *Id.* (quoting *Macris & Assocs., Inc. v. Neways, Inc*, 2000 UT 93, ¶ 20, 16 P.3d 1214).

[115] *Hatch*, 471 F.3d at 1146, 1148.

[116] *Id.* at 1147.

22

theory of the new claim need not be exactly identical to that of the first claim — rather, "the question is whether there is an identity of facts and evidence between the two claims'"[117] — and that Plaintiffs need only raise claims if the related facts occurred prior to *filing* the previous suit, not prior to *judgment* in that suit.[118]  Therefore, the Circuit reasoned, Plaintiffs must be barred from bringing claims that involve identical facts or evidence that arose prior to the July 12, 1999 filing of their state court action.[119]  The Circuit thus suggested that because this court used the judgment date rather than the filing date in its preclusion analysis, the subdivision development claim and three others may have been improperly precluded.[120]

This court finds that while the 1999 state judgment does not preclude any of Plaintiffs' state subdivision claims, the 1996 federal judgment does preclude Mr. Hatch's state subdivision claims.  The Tenth Circuit noted that the 1999 state suit does not appear to apply to the current subdivision claims due to a "lack of identity" between the claims; however, the Circuit remained silent as to whether the 1996 federal suit precludes them.  This court, therefore, must decide the question of which law governs state claims in federal court where the claims are alleged to be precluded by a prior federal ruling.

First, "[i]t has long been established that the judgments of the federal courts are to be

_____

[117] *Id.* (quoting *Macris*, 2000 UT 93, ¶ 28).

[118] *Hatch*, 471 F.3d at 1147 (giving July 12, 1999 as the filing date of the prior suit and as the appropriate date for claim preclusion).

[119] *Id.* at 1148.

[120] *Id.* at 1147 n.6 (stating that claim preclusion does not appear to apply to the claims regarding the subdivision development, the conveyance of the adjacent cul-de-sac, the licensing issues, and the exclusion from the library).

accorded full faith and credit when a question of their recognition arises in a state court or in another federal court,"[121] and that a "prior federal judgment . . . extinguishes [state law claims]."[122]  In addition, the general rule is that "federal courts [must] look first to state preclusion law in determining the preclusive effects of a state court judgment."[123]  This approach applies equally as well to state claims in federal court where there has been a prior federal court judgment: at least one Utah court, in determining that federal preclusion law should apply to federal judgments in state court, has noted that "there will usually be no difference in outcome from applying Utah common law on res judicata."[124]  Moreover, the *Restatement (Second) of Judgments* states that historically "there was little difference in the doctrine of res judicata as expounded in state and federal courts.  Indeed, that is still true, so that it is still usually a moot question whether the effect of a federal judgment is determined by federal law or state law."[125]  Accordingly, this court will apply Utah claim preclusion law to the state subdivision development claims in this case.

In so doing, this court finds that Mr. Hatch's state subdivision claims are precluded

---

[121] RESTATEMENT (SECOND) OF JUDGMENTS § 87.

[122] *Rivet v. Regions Bank*, 522 U.S. 470, 478 (1998) (citing *Sunnen*, 333 U.S. at 597).

[123]  *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380-81 (1985) (stating that 23 U.S.C. § 1738 directs federal courts to "refer to the preclusion law of the State in which judgment was rendered"); *see also Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 877 (10th Cir. 2006) ("Collectively, the broad command flowing from [past] cases requires federal courts to apply state substantive law and federal procedural law." (internal quotations and citation omitted)).

[124] *Massey v. Bd. of Trs. of the Ogden Area Cmty. Action Comm., Inc.*, 2004 UT App 27, ¶ 7, 86 P.3d 120.

[125] RESTATEMENT (SECOND) OF JUDGMENTS § 87.

because they are identical to the facts and evidence presented in the 1996 federal action.  The

facts used to support his state subdivision claims include his problems installing utilities, clearing

the road, and acquiring a permit through a qualified inspector, all of which were raised in the

1996 suit.[126]  And he does not allege any facts regarding the Brooks Subdivision development

that transpired after the April 1996 filing of the prior federal suit.

### b.  Federal Claim Preclusion Law

Mr. Hatch's federal subdivision claims are also precluded because they are transactionally

related to the claims brought in his 1996 federal suit.  The transactional test controls preclusion

related to the 1996 federal court action.  Under federal law, claim preclusion is appropriate when

three elements are satisfied: "(1) a judgment on the merits in the earlier action, (2) identity of the

parties or their privies in both suits, and (3) identity of the cause of action in both suits."[127]  Only

the third element, "identity," is at issue here.[128]

The determinative question for identity in the Tenth Circuit is whether the claims raised

in a new complaint "arose out of the same transaction as the claims in the prior action, and

should therefore have been included in the prior action."[129]  Filing the complaint "frames the

scope of litigation," but new rights acquired after filing and before judgment in the prior action

---

[126] *See* Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶¶ 12, 13, 15-22, 24, 26.

[127] *Hatch*, 471 F.3d at 1149 (citing *Yapp,* 186 F.3d at 1226).

[128] *Hatch*, 471 F.3d at 1149 ("The only meritorious argument that Hatch makes pertains to the third element . . . .").

[129] *Id.* at 1148 (stating that the filing of the federal complaint "frames the scope of litigation," but that a claim "should not be precluded merely because it is based on facts that arose prior to the entry of judgment in the previous action." (citing *Mitchell v. City of Moore*, 218 F.3d 1190, 1202 (10th Cir. 2000))).

are not necessarily precluded by res judicata.[130]  Under the transactional test, however, a new

action is permitted only when it "raises new and independent claims, not part of the previous

transaction, based on the new facts."[131]  Therefore, only those of Mr. Hatch's federal subdivision

claims that are "new and independent" avoid preclusion.[132]

    As a result, this court must decide whether Mr. Hatch's current federal subdivision claims

are "new and independent," or whether they arose out of the same "transaction, or series of

connected transactions" as the 1996 federal suit. [133]  To determine whether a claim arose out of

the same transaction or series of connected transactions, the court considers "whether the facts

are related in time, space, origin, or motivation, whether they form a convenient trial unit and

whether their treatment as a unit conforms to the parties' expectations or business understanding

or usage."[134]

    Here, Mr. Hatch's federal subdivision claims fail because they are neither new nor

independent.  Mr. Hatch makes four arguments for why these federal claims are not precluded:

(1) the issues decided in the previous federal case were "not identical to the issues in this case,"

(2) claims arising after the 1996 federal suit could not have been litigated in that suit, (3) the

---

[130] *Hatch*, 471 F.3d at 1150 (quoting *Computers Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 369-70 (2d Cir. 1997)).

[131] *Hatch*, 471 F.3d at 1150 (citing *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 384 (2d Cir. 2003) ("Where the facts that have accumulated after the first action *are enough on their own* to sustain the second action, the new facts clearly constitute a new 'claim,' and the second action is not barred by *res judicata*.")).

[132] *Hatch*, 471 F.3d at 1150.

[133] *Id.* at 1151.

[134] *Id.* at 1149 (citing *Yapp*, 186 F.3d at 1227 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24 (internal quotations omitted)).

issues presented in this case "were not decided in a final judgment on the merits" in the prior

case, and (4) the issues presented in this case were not "actually litigated in the prior

proceedings."[135]  None of these arguments, however, addresses federal preclusion law as laid

down by the Tenth Circuit.

As the Circuit has stated, federal law does not limit the meaning of "identical" claims to

claims that are exactly the same; rather, the meaning includes claims that "arose out of the same

transaction as the claims in the prior action, and should therefore have been included in the prior

action."[136]  All of the facts regarding the Brooks Subdivision development — the use of the

easement, the difficulty in obtaining utilities, and the conflict over the building inspector — were

part of the prior federal lawsuit and arose from the same transaction, or series of transactions, as

the claims presented therein.[137]  In 1996, those facts helped to establish a due process violation by

Boulder in its failure to give Mr. Hatch a business license for retail, camping, and beer sales.  As

with the state claims, Mr. Hatch cannot now bring a new federal action against Boulder arising

out of the exact same facts and the exact same transactions.  Indeed, this court finds that the facts

in both cases regarding the Brooks Subdivision development are related in time, space, origin

and motivation, that they form a convenient trial unit, and that their treatment as a unit conforms

to the parties' expectations.  Additionally, Mr. Hatch never even asserts that this claim is "based

on . . . new facts," as required by the Circuit.  Thus, this court finds that Mr. Hatch has failed to

bring  "new and independent claims, not part of the previous transaction, based on the new

---

[135] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. 4-6.

[136] *Hatch*, 471 F.3d at 1149.

[137] *See* Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. ¶¶ 12, 13, 15-22, 24, 26.

facts."[138]

As all of the transactions upon which the subdivision claims are based arose before, and were included in, the 1996 federal case, Mr. Hatch's second argument — that the issue could not have been raised in the prior case — is also without merit.  This argument merely reiterates the first by saying that the subdivision issue could not and should not have been raised because the issue is not identical to the issues in the previous action.

Mr. Hatch's third argument, moreover, appears to improperly combine the requirement of a judgment on the merits with the requirement of identity of claims.  He asserts that the issues he considers "new" should not be precluded because the 1996 case did not reach a judgment on the merits with regard to those "new" issues.  However, the transactional test treats the issues of identity and judgment on the merits separately.  The 1996 federal action was decided in favor of Mr. Hatch, thus satisfying the requirement of a judgment on the merits.  If any question remained, the Tenth Circuit has stated that as to a judgment on the merits, identity of the parties, and identity of cause of action, "the only meritorious argument that Hatch makes pertains to the third element: whether the cause of action sought to be precluded is identical with that raised in the prior action."[139]  Consequently, this court finds that the 1996 case was reached on the merits.

Mr. Hatch's fourth argument appears to be nothing more than a restatement of his first: that the claims presented in this case are not identical to those litigated in the 1996 case.  However, "[w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated within the meaning of this

---

[138] *See Hatch*, 471 F.3d at 1150.

[139] *Id.* (noting first that identity of the parties was not satisfied).

Section."[140]  And here, the issue in question — the due process violations by Boulder in the 1996

action — has already been litigated.  Because any new claims must be based on new facts that

have occurred after the filing of the first federal lawsuit, it is therefore impermissible for Mr.

Hatch to bring a previously litigated, five-year-old due process claim.

### b.  Inapplicability of Claim Preclusion to Ms. Mitchell

On the other hand, Ms. Mitchell was not a party to the prior federal suit; therefore, any

state or federal subdivision development claims she may have are not precluded by Mr. Hatch's

1996 federal suit.[141]  According to the Tenth Circuit, privity requires "a substantial identity

between the issues in controversy and a showing that the parties in the two actions are really and

substantially in interest the same."[142]  In addition, federal law "will incorporate state law when

the issue is more distinctly substantive, as with the concept of privity"[143]; and under Utah law,

"[t]he legal definition of a person in privity with another, is a person so identified in interest with

another that he represents the same legal right.  This includes a mutual or successive relationship

to rights in property."[144]  Also, "privity depends mostly [on the parties'] relationship to the

subject matter of the litigation."[145]

---

[140]  RESTATEMENT (SECOND) OF JUDGMENTS § 27(d).

[141]  *See Hatch*, 471 F.3d at 1149.

[142]  *Lowell Staats Mining Co., Inc. v. Philadelphia Elec. Co.*, 878 F.2d 1271, 1275 (10th Cir. 1989).

[143]  *Id.*

[144]  *Searle Bros. v. Searle*, 588 P.2d 689, 691 (Utah 1978).

[145]  *Press Publ'g, Ltd. v. Matol Botanical Int'l, Ltd.*, 2001 UT 106, ¶ 20, 37 P.3d 1121 (internal quotations and citation omitted).

Here, Boulder argues that the frequent property conveyances and the close personal relationship between Mr. Hatch and Ms. Mitchell supports a finding of privity between the two for the 1996 action. This court, however, finds Ms. Mitchell's connection to the prior action too attenuated. In this case, it would be unfair to deny Ms. Mitchell an opportunity to bring suit for any subdivision development claims she may have on account of Mr. Hatch having used the same facts to bring his claims regarding the prior licensing issues. Thus, in accord with the Tenth Circuit's finding, Ms. Mitchell's Brooks Subdivision claims do not fail based on privity with Mr. Hatch. Despite this determination, however, her claims fail on other grounds.

### 2. Statute of Limitations

Aside from claim preclusion, the Brooks Subdivision claims are barred by the statute of limitations because they accrued more than four years ago. State law governs the statute of limitations for § 1983 claims.[146] In January 2001, when Plaintiffs filed the present case, Utah Code Annotated § 78-12-25 read, "An action may be brought within four years . . . for relief not otherwise provided for by law."[147] At that time, "all section 1983 claims brought in federal court in Utah [were] subject to the four-year limitations period provided in Utah Code Ann. § 78-12-25."[148] And despite apparent efforts by the Utah legislature to reduce the statute of limitations for § 1983 claims to two years, the four-year statute of limitations stands and is the correct measure

---

[146] *Mismash v. Murray City*, 730 F.2d 1366, 1367 (10th Cir. 1984).

[147] UTAH CODE ANN. § 78-12-25 (2000).

[148] *Mismash*, 730 F.2d at 1367.

for the present claim.[149]

Although state law governs the applicable statute of limitations, the point at which a claim accrues is governed by federal law[150]; and under federal law, a § 1983 claim accrues when the plaintiff "knows or has reason to know of the injury which is the bases of his action."[151] Here, at the very latest, Plaintiffs knew or had reason to know of any injury related to the Brooks Subdivision by October 1995. By that time, they had experienced problems obtaining water, electricity, and phone service, and believed that Boulder was acting "illegally" regarding the town inspector.

Plaintiffs argue that their claims are not untimely because the town still refuses to "abandon the subdivision."[152] This argument is irrelevant to the development claims, but will be discussed below when this court analyzes the conveyance of the adjacent cul-de-sac. However, even if the argument were related, it fails to address the issue of accrual. Because over four years have passed since the Brooks Subdivision claims accrued, the claims are barred by the statute of limitations.

---

[149] *See Whitehat v. College of E. Utah*, 111 F. Supp. 2d 1161, 1162-63 (D. Utah 2000) (stating that the "applicable statute of limitations is the four year statute set forth in § 78-12-25(3)," not the two year statute of limitations the Utah legislature attempted to establish in § 78-12-28(3)); *Sheets v. Salt Lake County*, 45 F.3d 1383, 1387 (10th Cir. 1995) ("a four-year statute of limitations under Utah Code Ann. § 78-12-25(3) governs § 1983 actions"); *Arnold v. Duchesne County*, 26 F.3d 982, 989 (10th Cir. 1994) (leaving the statute of limitations at four years and stating that by passing § 78-12-28(3) in 1987, the Utah legislature "attempt[ed] to do that which it cannot — to unilaterally declare that the statute of limitations for section 1983 actions in Utah shall be two years").

[150] *Kripp v. Lutton*, 466 F.3d 1171, 1175 (10th Cir. 2006).

[151] *Id.*

[152] Pls.' Mem. Opp'n Def.'s Second Mot . Summ. J. 2.

31

Boulder incorrectly argues that the claims fail Utah's one-year notice-of-claim requirement.  Utah law bars claims against the state or its departments "unless notice of claim is filed . . . within one year after the claim arises . . . ." [153]  Also, when the sovereign grants a right of action against itself, "conditions placed on those rights must be followed precisely"[154]; and in suits against cities, notice must include: "(i) a brief statement of the facts; (ii) the nature of the claim asserted; and (iii) the damages incurred by the claimant so far as they are known."[155]  Notice must be signed and delivered to "the city or town recorder."[156]  Here, Plaintiffs rightly contend that "state notice of claim requirements do not apply in section 1983 suits,"[157] as courts are reluctant to allow states to set a condition precedent on the right to bring a § 1983 action.[158]

Additionally, the Utah Supreme Court has not applied the one-year notice requirement in actions seeking equitable relief.[159]  In *American Tierra v. City of West Jordan*, a developer sued a city for return of impact fees assessed pursuant to an invalid ordinance.[160]  Reversing summary

---

[153] UTAH CODE ANN. § 63-30-12 (2000).

[154] *Wheeler v. McPherson*, 2002 UT 16, ¶ 11, 40 P.3d 632 (internal quotations and citation omitted).

[155] UTAH CODE ANN. § 63-30-11 (2000).

[156] *Id.*

[157] *Rosa v. Cantrell*, 705 F.2d 1208, 1221 (10th Cir. 1982); *see also* Felder v. Casey, 487 U.S. 131, 140 (1988) ("the lower federal courts have all, with but one exception, concluded that notice-of-claim provisions are inapplicable to § 1983 actions brought in federal court").

[158] *Cantrell,* 705 F.2d at 1208.

[159] *Houghton v. Dep't of Health*, 2005 UT 63, ¶ 19 n.3, 125 P.3d 860; *Am. Tierra Corp. v. City of W. Jordan*, 840 P.2d 757, 760 (Utah 1992).

[160] *Am. Tierra*, 840 P.2d at 756.

judgment for the city, the Utah Supreme Court held that the "subdivider's claims were equitable and exempt from filing requirements and time limits imposed by Governmental Immunities Act."[161]

Applying these principles to the present case, Plaintiffs argue that they are only seeking equitable relief on their state claims.[162]   Accordingly, this court will apply only the four-year statute of limitations and not the one-year notice requirement.

### 3.  § 1983

Plaintiffs' subdivision development claims fail to raise a triable issue under § 1983. Plaintiffs have  raised a number of constitutional claims, and, although they bring the claims under 42 U.S.C. § 1983 against the Boulder Town Council (and no individually named defendants), they fail to discuss municipal liability.  Instead, at times Plaintiffs plead as if they are bringing their claims directly under the Constitution.  But where relief is available under § 1983, courts refuse to allow actions directly under the Constitution.[163]

Section 1983 provides a cause of action against any person who deprives another "of any rights, privileges, or immunities secured by the Constitution and laws" under the color of state law.[164]  But to properly invoke this statute a complaint "must assert the violation of a federal

---

[161] *Id.*

[162] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. 3.

[163] *See Stanko v. Mahar*, 419 F.3d 1107, 1110 (10th Cir. 2005); *Baxter by Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 732 n.3 (7th Cir. 1994); *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992); *Pauk v. Bd. of Trs. of the City Univ. of New York*, 654 F.2d 856, 865 (2d Cir. 1981).

[164] *Main v. Thiboutot* , 448 U.S. 1, 4 (1980); *Rural Water Dist. No. 1 v. City of Wilson*, 243 F.3d 1263, 1274 (10th Cir. 2001).

right, not merely a violation of federal law."[165]  Indeed, the deprivation of rights must be

deliberate because § 1983 imposes no liability for mere negligence.[166]  In other words, parties

may not use § 1983 suits to duplicate state tort law on a federal level.[167]

Moreover, municipal liability is not established solely because an employee inflicts

constitutional injury on another.[168]  To be liable, the governmental entity itself must be

responsible for the injury through an act or edict that can fairly be said to represent official

policy[169] — "[t]hat is, a plaintiff must show that the municipal action was taken with the requisite

degree of culpability and must demonstrate a direct causal link between the municipal action and

deprivation of federal rights."[170]  When a policy is lawful on its face, "rigorous standards of

culpability and causation must be applied to ensure that the municipality is not held liable solely

for the actions of its employee."[171]  Therefore, municipalities may only be held liable under §

1983 if the plaintiff establishes: (1) a municipal policy or custom existed, and (2) the policy or

custom is directly and causally linked to the alleged injury.[172]

Here, Plaintiffs fail to show how Boulder's actions or inaction regarding the subdivision

---

[165] *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).

[166] *See Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992).

[167] *See Medina v. Denver*, 960 F.2d 1493, 1495 (10th Cir. 1992).

[168] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 568, 694 (1978).

[169] *Id.*

[170] *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

[171] *Id.* at 405.

[172] *Canton v. Harris*, 489 U.S. 378, 385 (1989).

deprived them of any federal rights.  Plaintiffs seem to claim (1) a federal right to have Boulder require the original subdivision developer to post a bond and place money in escrow according to Boulders subdivision ordinance, (2) a federal right to have utilities buried in the utility easement, (3) a federal right to have Boulder clear a road, and (4) a federal right not to be required to pay extra money to an out-of-town building inspector (money which Plaintiffs never even paid). Although Plaintiffs provide extensive narrative regarding these issues, they fail to show that these issues arose from any municipal policy or custom.  For example, regarding the fourth issue, Plaintiffs provide a statement from one developer stating that he obtained a permit with extreme difficulty, but such evidence is insufficient to establish a policy or custom.  Furthermore, no case law supports Plaintiffs' claims that these issues show violations of any federally protected rights. Accordingly, this court finds that Plaintiffs' § 1983 claims are invalid.

### a. Takings

Plaintiffs' allegations fail to establish either a federal or a state takings claim. The Fifth Amendment to the federal Constitution guarantees that private property will not be "taken for public use, without just compensation."[173]  The Fourteenth Amendment makes this law applicable to the states.[174]  Generally, takings occur only in instances of "direct appropriations of property or the functional equivalent of a practical ouster of [the owner's] possession."[175]  The Supreme Court also recognizes that in some cases, "permissible regulatory action by the state

---

[173] U.S. Const. Amend. V.

[174] *Kelo v. City of New London*, 545 U.S. 469, 472 (2005).

[175] *Clajon Prod. Corp. v. Petera*, 854 F. Supp. 843, 851 (D. Wyo. 1994) (quoting *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992) (internal quotations omitted)).

which 'goes too far' in redefining . . . the ownership of property may constitute a taking,"[176] and

that takings claims may result from "regulations that deny a landowner 'all economically

beneficial or productive use of land.'"[177]   Accordingly, when reviewing a takings claim, courts

should consider "[t]he economic impact of the regulation on the claimant and . . . the extent to

which the regulation has interfered with distinct investment-backed expectations."[178]   At the

same time, the court should consider "the character of the governmental action," as physical

invasion by the government more readily supports a taking than does "some public program

adjusting the benefits and burdens of economic life to promote the common good."[179]

Like the federal Constitution, the Utah Constitution guarantees that private property

"shall not be taken or damaged for public use without just compensation."[180]   Under Utah law,

"[a] taking is any substantial interference with private property which destroys or materially

lessens its value, or by which the owner's right to its use and enjoyment is in any substantial

degree abridged or destroyed."[181]   Claimants must establish that they "possess some protectable

interest in property before [being] entitled to recovery under this [takings] provision."[182]   Utah

---

[176] *Petera*, 854 F. Supp. at 851 (citing *Lucas*, 505 U.S. at 1013).

[177] *Petera*, 854 F. Supp. at 852 (quoting *Lucas*, 505 U.S. at 1015).

[178] *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (citation omitted).

[179] *Id.* (citation omitted).

[180] UTAH CONST. art. I, § 22.

[181] *Utah Pub. Employees Ass'n v. State*, 2006 UT 9, ¶ 26, 131 P.3d 208 (internal quotations omitted).

[182] *Id.* at ¶ 27.

law also provides an adequate procedure to deal with violations: "In Utah, the appropriate post-taking remedy is an inverse condemnation action . . . . 'Unless and until plaintiffs avail themselves of [the inverse condemnation] remedy, their takings claims will remain unripe.'"[183]

In this case, Plaintiffs have failed to provide any evidence that would support either a federal or a state takings claim in their easement, road, or inspector allegations. Though presented as evidence against Boulder, Plaintiffs' frustration with private phone, water, and electric companies does not implicate the city. Also, no case law supports a property owner's right to be compensated when an utility company fails to use an easement granted to the utility company.

Likewise, the complaints about the road do not constitute a taking. In requiring the subdeveloper to clear the road, Boulder did not physically invade Plaintiffs' property. Neither did Boulder go "too far" in redefining the ownership of the property — Boulder did not substantially interfere with the road in any way that destroyed or materially lessened its value.

Moreover, even if Boulder's practice was to allow an unlicensed inspector to inspect property, and even if Plaintiffs refused to use that inspector and Boulder required Plaintiffs to pay additional money to import an out-of-town inspector, these facts do not amount to a regulatory taking. Boulder's alleged actions did not constitute a physical invasion by the government. At the same time, these alleged actions did not substantially interfere with private property in any way that destroyed or materially lessened its value. Besides potentially requiring Plaintiffs to spend a few hundred dollars more than expected — money that Plaintiffs never even spent — it

---

[183] *Patterson v. Am. Fork City*, 2003 UT 7, ¶ 35, 37 P.3d 466 (quoting *Bell v. Am. Fork City*, No. 98-4215, 1999 WL 1079601, at *2 (10th Cir. Nov. 30, 1999)).

is unclear that Boulder's actions had any economic impact whatsoever on Plaintiffs' subdivision development.

Further, "the State of Utah . . . provide[s] a procedure for obtaining compensation for a taking of private property for public use, and because the Fifth Amendment 'requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action,' [his] failure to avail himself of the procedure renders his claim premature."[184]  Here, Plaintiffs claim that because they made many requests to town officials and because they sued previously, they have "exhausted other measures and have taken reasonable efforts to obtain relief."[185] Plaintiffs, however, do not claim to have pursued an inverse condemnation remedy. Additionally, they give no explanation as to how their facts establish a federal or a state takings violation under a rough proportionality test, a permanent-deprivation-of-all-beneficial-use test, or any other recognized test for takings violations.

### b.  Subsumed

Plaintiffs' due process and equal protection claims are subsumed by their takings claims. "Because the Just Compensation Clause of the Fifth Amendment imposes very specific obligations upon the government when it seeks to take private property," the Tenth Circuit has expressed its unwillingness, in claims that fall within that clause, to "impose new and potentially inconsistent obligations upon the parties under the substantive or procedural components of the

---

[184] *Bateman v. City of W. Bountiful*, 89 F.3d at 704, 709 (Utah 1996) (quoting *Williamson County Regional Planning Comm'n*, 473 U.S. 172, 195 n.13 (1985)).

[185] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. 8.

Due Process Clause."[186]  In *Bateman v. City of West Bountiful*, defendant city issued the plaintiff

a certificate of noncompliance indicating his property violated the city's setback and side yard

requirements. Instead of seeking a variance, the plaintiff went to federal court asserting a Fifth

Amendment takings claim, a due process claim, and an equal protection claim.[187]  The district

court, however, dismissed the complaint on ripeness grounds.[188]  The Tenth Circuit affirmed the

dismissal and concluded that the plaintiff's "due process and equal protection claims [were]

subsumed within 'the more particularized protections of the [Takings] Clause."[189]  In other

words, where "due process and equal protection claims [] rest upon the same facts as a

concomitant takings claim," the due process and equal protection claims are subsumed in the

takings claim.[190]  Here, because Plaintiffs rest their Brooks Subdivision takings claims on the

same facts as their subdivision due process and equal protection claims, the due process and

equal protection claims are subsumed by their takings claims.

### c.  Procedural Due Process

Plaintiffs' Brooks Subdivision procedural due process claims also fail independently.

The Fourteenth Amendment protects citizens against deprivations of life, liberty, or property

without due process.[191]  To establish a procedural due process claim, Plaintiffs "first must

---

[186] *Miller v. Campbell County*, 945 F.2d 348, 352 (10th Cir. 1991); *see also Bateman*, 89 F.3d at 709.

[187] *Bateman*, 89 F.3d at 705.

[188] *Id.* at 706.

[189] *Id.* at 709 (quoting *Miller*, 945 F.2d at 352).

[190] *Bateman*, 89 F.3d at 709.

[191] U.S. CONST. amend. XIV.

demonstrate that [they] possessed a property or liberty interest."[192]  Put differently, a plaintiff

must have a "legitimate claim of entitlement to some benefit."[193]  Such interests do not spring

from the Constitution, but "arise from independent sources such as state statutes, local

ordinances, established rules, or mutually explicit understandings."[194]  Also, it is the plaintiff's

initial burden to demonstrate the existence of a protected interest.[195]  Once established, the

plaintiff must then show that the defendants deprived him of that interest without the appropriate

level of process.[196]  However, "[u]nless a person asserts some basis for contesting a governmental

deprivation of life, liberty, or property, he is not injured by defective procedures he has no

occasion to invoke."[197]

     In the present case, Plaintiffs claim protected property interests in the right to force utility

companies to bury their lines in easements if such easements exist, the right to obtain building

permits without Boulder's "illegal" building inspector, and the right to have a plotted road

cleared or developed by the city.  However, "[a]n abstract need for, or unilateral expectation of, a

benefit does not constitute 'property.'"[198]  It is Plaintiffs' burden to demonstrate the existence of

---

[192] *Nard v. City of Oklahoma*, 153 F. App'x 529, 533 (10th Cir. 2005) (citing *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1135 (10th Cir. 1994)).

[193] *Hyde Park Co. v. Santa Fe City Council,* 226 F.3d 1207, 1210 (10th Cir. 2000) (citing *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972)).

[194] *Dickeson v. Qaurberg*, 844 F.2d 1435, 1437 (10th Cir. 1988) (citing *Perry v. Sindermann*, 408 U.S. 593, 601 (U.S. 1972)).

[195] *See Watson v. Univ. of Utah*, 75 F.3d 569, 578 (10th Cir. 1996).

[196] *See id.* at  577.

[197] *Rector v. City & County of Denver*, 348 F.3d 935, 943-44 (10th Cir. 2003).

[198] *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).

a protected property interest, and this court finds that they have failed to carry that burden here.

### d. Substantive Due Process

Plaintiffs claims also fail to show a substantive due process violation.  Substantive due process is likewise rooted in the Fourteenth Amendment, but as "[p]rocedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, . . . substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision."[199]  The threshold question for a substantive due process claim is whether the government's action deprived the plaintiff of a "protectable property interest."[200]  In other words, a plaintiff must have a "'legitimate claim of entitlement' to some benefit."[201]  In *Hyde Park v. Santa Fe City Council*, a municipal land-use regulation case, the plaintiff's proposed subdivision plat met all of the plat development requirements, but the City Council refused to approve the plat.[202]  Plaintiff sued, claiming a constitutional entitlement to the proposed development.[203]  The court held that a plaintiff "must show that under the applicable law, the City Council had limited discretion to disapprove the proposed plat.  'Otherwise, the city's decision making lacks sufficient substantive limitations to invoke due process guarantees.'"[204]  Additionally, the court held that absent

---

[199] *Id.*

[200] *Id.*

[201] *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

[202] *Id.* at 1209.

[203] *Id.*

[204] *Id.* (quoting *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, 927 F.2d 1111, 1116 (10th Cir.1991)).

statutory language imposing "significant substantive restrictions," the City Council had broad discretion in the matter.[205]

Here, Plaintiffs claims regarding the road development and the utility easement are analogous to those raised in *Hyde Park*.  Accordingly, if Boulder had any obligation to clear the road or to bury the utility lines, it similarly had broad discretion in the matter.  Plaintiffs, however, have failed to show why Boulder had any obligation to clear the road or to bury the utility lines.  And even if Boulder had such an obligation, Plaintiffs have failed to show why for some reason Boulder had more limited discretion.

Further, the claims regarding the "illegal program" raise the issue of arbitrary governmental actions.  Substantive due process protects citizens against "arbitrary action of government" and bars "certain government actions regardless of the fairness of the procedures used to implement them."[206]  Substantive due process also safeguards citizens' "fundamental" rights[207] — rights that are based not on state law "but [that] are founded upon 'deeply rooted notions of fundamental personal interests derived from the Constitution.'"[208]  A showing that the government merely "intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power" does not create a substantive due process violation.[209]  Rather, "Plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual

---

[205] *Hyde Park*, 226 F.3d at 1212-1213 (citing *Jacobs*, 927 F.2d at 1117 n.4).

[206] *Perez v. Unified Gov't of Wyandotte County/Kansas City, Kansas*, 432 F.3d 1163, 1166 (10th Cir. 2005) (quoting *County of Sacramento v.  Lewis*, 523 U.S. 833, 840 (1998)).

[207] *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998).

[208] *Id.* (citing *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir. 1986)).

[209] *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995).

harm that is truly conscience shocking."[210]  Moreover, when determining what conduct is conscience shocking, the Tenth Circuit weighs: "'(1) the need for restraint in defining the scope of substantive due process claims; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting public safety.'"[211]

In an analogous case before this court, *Highland Development, Inc. v. Duchesne County*, a developer claimed that the city maliciously delayed construction of a development by imposing irrational and burdensome requirements throughout the permitting process.[212]  The *Highland* court ruled that plaintiff's claim failed, however, because the city's action was not egregious enough to shock the court's conscience.  Similarly, the Third Circuit recently rejected a less stringent "improper motive" test for land-use claims in favor of the more stringent "shocks the conscience" test, a test which encompasses only "the most egregious official conduct."[213]

Here, Boulder's alleged action regarding the "illegal program" does not amount to conscience-shocking behavior.  Indeed, even if Boulder intended to ruin Plaintiffs' property rights and to run them out of town, "a culpable mental state, alone, is insufficient to establish a violation of substantive due process."[214]  At the same time, requiring Plaintiffs to choose between

---

[210] *Perez*, 432 F.3d at 1166.

[211] *Highland Dev., Inc. v. Duchesne County*, No. 203-CV-750 TC, 2007 WL 702237, at *27 (D. Utah Mar. 2, 2007) (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1184 (10th Cir. 2002)).

[212] *Highland Dev.*, 2007 WL 702237 at *2.

[213] *United Artists Theatre Circuit v. Township of Warrington, Pa*, 316 F.3d 392, 400 (3d Cir. 2003) (quoting *Lewis*, 523 U.S. at 846).

[214] *Graves v. Thomas*, 450 F.3d 1215, 1222 (10th Cir. 2006) (citing *Lewis*, 523 U.S. at 847 n.8 (noting that to establish a substantive due process violation, plaintiffs must show that

an unqualified building inspector or an out-of-town building inspector does not demonstrate either egregious official conduct or an outrageous abuse of governmental power.

Even so, Plaintiffs state without citation that "whether the Town's conduct is 'conscience shocking' is a question of fact'" for a jury to decide.[215]  This statement, however, is clearly refuted by *Graves v. Thomas*, in which the Tenth Circuit stated that the "ultimate standard" of an substantive due process violation claim was whether the alleged action shocks the conscience "of federal judges," not juries.[216]  Indeed, the Circuit observed, "[w]hen applying this standard, '*we* must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.'"[217]  Clearly these are factors for federal judges — not juries — to consider.

Accordingly, this court finds that Boulder's alleged actions do not amount to a substantive due process violation.

### e.  Equal Protection

Plaintiffs' claims also fail to show an equal protection violation.  The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal

---

"the behavior of the [] officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience")).

[215] Pls.' Mem. Opp'n Def.'s Second Mot. Summ. J. 10.

[216] *See* 450 F.3d at 1220 (internal quotations and citation omitted).

[217] *Graves*, 450 F.3d at 1220-21 (quoting *Uhlrig*, 64 F.3d at 573 (emphasis added)).

protection of its laws."[218]  A plaintiff may bring an equal protection claim either first, as a member of a suspect class, or second, in a "class of one" case.[219]

First, in cases "[w]here discrimination is not targeted against a particular religion, but against those who do not share a particular religious belief, the use of the protected class factor is inappropriate."[220]  Accordingly, Plaintiffs — who claim discrimination *by* those of a particular religion — do not qualify for classification within a protected class.

In class of one cases, moreover, a "public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive."[221]  A plaintiff must prove that: (1) she "has been intentionally treated differently from others similarly situated," and (2) "there is no rational basis for the difference in treatment."[222]  Also, when making an equal protection claim against a municipality under § 1983, these factors must be established in addition to § 1983 requirements of a policy or custom causally linked to the constitutional injury.

Here, although Plaintiffs argue that they alone were required to sign affidavits agreeing to pay increased fees for an out-of-town inspector, Plaintiffs have not named one similarly situated person who was treated differently.  Neither have they attempted to show that Boulder's actions were objectively irrational or abusive.  On the other hand, there appears to be a rational basis for

---

[218] U.S. CONST. amend. XIV.

[219] *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

[220] *Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1038 (10th Cir. 1993).

[221] *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1209 (10th Cir. 2006).

[222] *Olech*, 528 U.S. at 564; *see also Jicarilla*, 440 F.3d at 1210-11.

Boulder's decisions regarding the utility easement, the street clearance or development, and the requirement to pay additional costs for an out-of-town inspector.  And Plaintiffs have suggested no real reason why it was irrational for Boulder to make any of these decisions.

### B.  Licensing Claims

Both Mr. Hatch's and Ms. Mitchell's licensing claims fail to establish any federal rights violations.

#### 1.  Mr. Hatch's Restaurant Business License Application

Boulder's decision not to issue Mr. Hatch a restaurant license did not violation his due process or equal protection rights.  Because Mr. Hatch's restaurant licensing claims present no issue of material fact, Boulder is entitled to summary judgment as a matter of law.

##### a.  Procedural Due Process

Mr. Hatch did not have a protectable property interest in a potential restaurant license.  A due process violation must arise from a "legitimate claim or entitlement" to the property.[223]  This claim or entitlement does not arise from the Constitution, but must come from an independent source of law.[224]  In the present case, Boulder's legal procedures for issuing business licenses provide the relevant source of law — and the evidence shows that Boulder cannot issue a restaurant business license without knowing whether "food service" consists of selling prepackaged food or of preparing food on site.  When Mr. Hatch requested a license for "food service," as required by the Health Department, Boulder requested that he clarify whether he intended to sell prepackaged food or to prepare food on site.  However, Mr. Hatch never

---

[223] *Olech*, 528 U.S. at 564.

[224] *Dickeson*, 844 F.2d at 1437.

provided any clarification.  And having failed to complete the required steps to obtain a restaurant business license, he cannot now claim that he possessed a protectable property interest in such a license.

### b.  Substantive Due Process

A state may not deprive individuals of a protectable property interest for "arbitrary reasons."[225]  For the reasons stated in the preceding subsection, however, Mr. Hatch did not have a protectable property interest in a potential restaurant license, and Boulder had valid legal reasons for requiring that he clarify whether "food service" consisted of selling prepackaged food or of preparing food on site.  Accordingly, Boulder did not violate Mr. Hatch's substantive due process rights by not providing him with a restaurant license.

### c.  Equal Protection

To bring an equal protection claim, a plaintiff must either be a member of a protected class or, in a class-of-one case, show that he "has been intentionally treated differently from others similarly situated," and that "there is no rational basis for the difference in treatment."[226] As explained above, Mr. Hatch has not shown he is a member of a protected class.  Furthermore, for the same reasons that he cannot establish a due process claim, he cannot establish an equal protection claim as a class of one — Boulder had valid legal reasons for requiring that he clarify whether "food service" consisted of selling prepackaged food or of preparing food on site, and his failure to do so provided a neutral, non-discriminatory basis for not providing him with the requested license.

---

[225] *Hyde Park*, 226 F.3d at 1210.

[226] *Olech*, 528 U.S. at 564.

47

### 2. Ms. Mitchell's Beer License Application

This court finds that Boulder's actions regarding Ms. Mitchell's beer license application did not violate her due process or equal protection rights. Her beer licensing claim presents no genuine issue of material fact, and Boulder is entitled to judgment as a matter of law.

### a. Procedural Due Process

Ms. Mitchell vaguely states that Boulder has not afforded her due process in obtaining a beer license and essentially claims that Boulder has violated her property interest. A due process violation must arise from a "legitimate claim or entitlement" to the property.[227] This claim or entitlement does not arise from the Constitution, but must come from an independent source of law.[228] Here, the independent source of law at issue is Ordinance 29B, which creates three beer licenses for the city of Boulder and stipulates that preference will be given to those who purchase a business that operates under a current beer license. Because Cottam Oil Company purchased a store with an existing beer license, it received preference in obtaining a license. Boulder also issued an additional beer license to settle an issue between the Owens and Mr. Besselsmith, who each claimed an interest in one of the city's existing three beer licenses. At no point, however, did Ms. Mitchell have any entitlement to a beer license under the ordinance. Accordingly, Boulder did not violate her procedural due process rights by not issuing her such a license.

### b. Substantive Due Process

A state may not deprive individuals of protectable property interests for "arbitrary

---

[227] *Id.*

[228] *Dickeson*, 844 F.2d at 1437.

reasons."[229]  For the reasons stated in the preceding subsection, however, Ms. Mitchell did not

have a protectable property interest in a potential beer license, and Boulder had valid legal and

logistical reasons for granting a beer license to Cottam Oil Company and for dividing a license

between the Owens and Mr. Besselsmith.  Accordingly, Boulder did not violate Ms. Mitchell's

substantive due process rights regarding her beer license application.

### c.  Equal Protection

To bring an equal protection claim, a plaintiff must either be a member of a protected

class or, in a class-of-one case, show that she "has been intentionally treated differently from

others similarly situated," and that "there is no rational basis for the difference in treatment."[230]

Here, Ms. Mitchell has not shown that she is a member of a protected class.  Furthermore,

for the same reasons that she cannot establish a due process claim, she cannot establish an equal

protection claim as a class of one — it was rational for Boulder to follow the ordinance which

gave preference to those who purchased stores with an existing beer license, and it was rational

for Boulder to divide the license between the Owens and Mr. Besselsmith to solve their licensing

dispute.

### C.  "Exclusion" from Library

Ms. Mitchell also argues that Boulder excluded her from the library because she was not a

member of a LDS ward, because she had made complaints regarding her licenses and her

---

[229] *Hyde Park*, 226 F.3d at 1210.

[230] *Olech*, 528 U.S. at 564.

property, and because she was scheduled to be a witness in Mr. Hatch's prior federal suit.[231]   This

court, however, finds that the Boulder Community Foundation's actions cannot be fairly

attributed to Boulder — any evidence which could potentially link the Foundation and Boulder is

based on inadmissible hearsay.   And even if the Foundation's actions could be attributed to

Boulder, these actions did not violate Ms. Mitchell's due process or equal protection rights.

### 1. Hearsay

"[T]estimony as to what a deceased person said during his lifetime is hearsay, and . . . a

declaration which is objectionable as hearsay is not rendered competent by the fact that declarant

has died since such declaration was made, even where the declaration is the only available

evidence bearing on the issue."[232]   Here, although Ms. Mitchell attempts to implicate Boulder

Officials through decedent Helen Lyman's statements, Ms. Mitchell provides no potentially

admissible evidence to support this allegation and makes no arguments as to why Ms. Lyman's

alleged statements qualify under any exception to the hearsay rule.

### 2. State Action

Ms. Mitchell's library claims also fail because the alleged actions taken to exclude her are

not fairly attributable to Boulder.   According to the Tenth Circuit, "four tests guide determination

of whether a private entity acts under color of law for the purposes of section 1983 ":

> (1) close nexus, in which a court examines "whether there is a sufficiently close
> nexus between the State and the challenged action of the regulated entity so that the
> action of the latter may be fairly treated as that of the State itself;" (2) symbiotic

---

[231] Although Ms. Mitchell appears to plead directly under the Constitution, for reasons
explained above in Section II.A.3. of this opinion, this court evaluates her claims under 42
U.S.C. § 1983.

[232] CJS EVIDENCE § 269.

relationship, in which a court examines the degree to which the State has "insinuated itself into a position of interdependence" with the private entity; (3) joint activity, in which a court will find state action where a private entity is a "a willful participant in joint activity with the State or its agents;" and (4) public function, in which a court will find state action where a private entity exercises "powers traditionally exclusively reserved to the State."[233]

Here, this court finds that there is not (1) a sufficiently close nexus, (2) a symbiotic relationship, or (3) sufficient joint activity between Boulder Community Foundation and the City of Boulder. Additionally, the Foundation does not (4) serve a public function which would traditionally be reserved to the state. Ms. Mitchell argues that Boulder provided the Library with a room in the Town Building and that the city requested that the building be open only during regular hours.[234] She also points to one town meeting where the library chairperson intended to send Boulder a letter reporting on the library's "status" and intention to seek more volunteers.[235] Although these facts indicate a degree of communication between the Foundation and Boulder, Ms. Mitchell presents no evidence that the Foundation was in any way answerable to Boulder or to the town's officials. Merely providing a room in the Town Hall, regulating the hours of the Town Hall, and one instance of the Foundation seeking volunteers through a town meeting is insufficient to show a close relationship or nexus between Boulder and the Foundation.

### 3. Procedural Due Process

As noted above, a due process violation must arise from a "legitimate claim or

---

[233] *Lewis v. Rite of Passage, Inc.*, No. 04 CV 01683 EWN PAC, 2006 WL 650192, at *9 (D. Colo. Mar. 10, 2006) (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995)).

[235] Exhs. to Mitchell's Decl. Opp'n Def.'s Second Mot. Summ. J. Exh. D.

entitlement" to the property.[236]  A claim or entitlement does not arise from the Constitution, but must come from an independent source of law.[237]  In this case, Ms. Mitchell's claim fails because it is not supported by an independent source of law which would entitle her to the volunteer position.  Additionally, her position as a volunteer librarian was not a protectable property interest: her position was not paid; she received no payment, no promise of payment, and no special privileges; and she was not assured that she would be there for any specific period of time.[238]

### 4.  Substantive Due Process

Also as stated above, a state may not deprive individuals of protectable property interests for "arbitrary reasons."[239]  Again, though, this court finds that Boulder is not accountable for the actions of the Boulder Community Foundation.  As a result, Ms. Mitchell did not possess any protectable property interest in a position as a volunteer librarian.

### 5.  Equal Protection

Further, to bring an equal protection claim, a plaintiff must either be a member of a protected class or, in a class-of-one case, show that she "has been intentionally treated differently from others similarly situated."[240]  Again, however, Ms. Mitchell — who claims discrimination *by* those of a particular religion — is not the member of a protected class.  In addition, she cannot

---

[236] *Olech*, 528 U.S. at 564.

[237] *Dickeson*, 844 F.2d at 1437.

[238] Mitchell Depo. 109-11.

[239]*Hyde Park*, 226 F.3d at 1210.

[240]*Olech*, 528 U.S. at 564.

establish a class of one because she fails to put forth any evidence showing any intentional, differential treatment of other volunteer librarians.

### D.  Conveyance of Adjacent Cul-de-Sac

Plaintiffs' claims regarding the cul-de-sac are barred by the statute of limitations.  In Utah, a four-year statute of limitations governs § 1983 claims[241]; and a § 1983 claim accrues when the plaintiff "knows or has reason to know of the injury which is the basis of his action."[242] In the present case, Plaintiffs knew or had reason to know of their alleged injury in 1992, when Boulder took steps to abandon the cul-de-sac but on advice from its attorney refused to quitclaim the property to them.  Even so, Plaintiffs did not bring the current suit until 2001, which is well beyond the four-year limitations period.

### E.  Boulder Business Brochure

#### 1.  Mootness

Plaintiffs' claims arising from the business brochure are moot.  "The touchstone of the mootness inquiry is whether the controversy continues to touch the legal relations of the parties having adverse legal interests in the outcome of the case."[243]  The legal interests, moreover, must be "more than simply the satisfaction of a declaration that a person was wronged."[244]  Here, then, the business brochure claims are moot because the brochure was never printed, and because Boulder reimbursed Plaintiffs for the money they spent towards the brochure.

---

[241]See Sheets v. Salt Lake County, 5 F.3d 1383, 1387 (10th Cir. 1995); Whitehat v. College of E. Utah, 111 F. Supp. 2d 1161, 1162-63 (D. Utah 2000).

[242]Kripp v. Lutton, 466 F.3d 1171, 1175 (10th Cir. 2006).

[243] Wirsching v. Colorado, 360 F.3d 1191, 1196 (10th Cir. 2004).

[244] Id.

Plaintiffs contend the issue is not moot because it touches on the 1998 business license claim, arguing that "the Town [made] unreasonable requests of the plaintiffs and denied due process to the plaintiffs in an attempt to exclude them from participating in the brochure."[245] Even though Plaintiffs claim they were singled out for the business licensing requirements, however, they present no potentially admissible evidence to support this claim.  Therefore, this court must grant summary judgment because Plaintiffs cannot bear this burden of proof at trial.[246]

### 2.  § 1983

Even if the business brochure claims were not moot, the facts fail to show any violation of due process or equal protection.

#### a.  Procedural Due Process

Boulder did not violate Plaintiffs' procedural due process rights.  As stated above, a due process violation must arise from a "legitimate claim or entitlement" to the property.[247]  This claim or entitlement does not arise from the Constitution, but must come from an independent source of law.[248]  In the present case, Plaintiffs provide no independent source of law which would support their entitlement to be included in a brochure that was never even printed.

This court also finds that Boulder did not violate Plaintiffs' procedural due process rights through alleged unreasonable requests to keep Plaintiffs from renewing their business license (which would have effectively excluded them from the brochure).  Boulder merely required

---

[245] *Id.*

[246] *See Celotex*, 477 U.S. at 322.

[247] *Olech*, 528 U.S. at 564.

[248] *Dickeson*, 844 F.2d at 1437.

54

Plaintiffs to pass a fire inspection, which in itself hardly seems unreasonable.  And once Plaintiffs passed the fire inspection, Boulder renewed their business licenses.  Although Plaintiffs argue that they alone were subject to the "unreasonable" fire inspection, they fail to present any evidence to support this claim.

### b.  Substantive Due Process

The facts as alleged are insufficient to raise a substantive due process action.  Substantive due process protects citizens' fundamental rights from arbitrary governmental action.[249]  To violate the protections of substantive due process, the government, through arbitrary, "conscience shocking" action, must deprive a plaintiff of a protectable property interest."[250]  As analyzed in the preceding subsection, however, Plaintiffs have not demonstrated any protectable property interest regarding access to the brochure.

### c.  Equal Protection

Plaintiffs' claims also fail to show an equal protection violation.  As stated above, to bring an equal protection claim, a plaintiff must either be a member of a protected class or, in a class-of-one case, show that she "has been intentionally treated differently from others similarly situated."[251]  Again, though, Plaintiffs — who claim discrimination *by* those of a particular religion — are not members of a protected class.  And neither plaintiff has proven any intentional, irrational, and differential treatment that would qualify him or her as a class of one.

First, Plaintiffs claim that Boulder required them to make a factual correction to the

---

[249] *See Hyde Park*, 226 F.3d at 1210.

[250] *See Perez*, 432 F.3d at 1166.

[251] *Olech*, 528 U.S. at 564.

proposed brochure listing.  But even if they had shown that others were not required to modify

their listings, this court finds a rational basis for requiring factually correct submissions.  Second,

Plaintiffs claim a right to be included in the brochure.  But given that the brochure was never

printed, *no one* was included; thus, all were treated the same.  Finally, Plaintiffs argue that they

were singled out for the fire inspection requirement.  As stated above, however, they present no

evidence to support that claim.

### F.  Sign Ordinance Violation

Plaintiffs' allegations regarding the sign ordinance are not ripe for review.  Under Article

III of the Constitution, this court only has subject matter jurisdiction over "cases and

controversies."[252]  "[T]he doctrine of ripeness is intended to prevent the courts, through

avoidance of premature adjudication, from entangling themselves in abstract disagreements."[253]

It is further intended to "forestall judicial determinations of disputes until the controversy is

presented in clean cut and concrete form."[254]  To determine ripeness "a court must look at '[1] the

fitness of the issue for judicial resolution and [2] the hardship to the parties of withholding

judicial consideration.'"[255]  In analyzing the first prong, "the court must determine whether the

matter involves uncertain events which may not happen at all, and whether the issues involved

are based on legal questions or factual ones."[256]  For the second prong, "we examine 'whether the

---

[252] *See United States v. Wilson*, 244 F.3d 1208, 1213 (10th Cir. 2001).

[253] *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1237 (10th Cir. 2004).

[254] *Id.*

[255] *Id.* (quoting *Wilson*, 244 F.3d at 1213).

[256] *Nielson*, 376 F.3d at 1237.

challenged action creates a direct and immediate dilemma for the parties.'"[257]

Here, under the first prong, Plaintiffs' sign ordinance claims are not ripe because the issues are not "fit for judicial resolution" and "[involve] uncertain events which may not happen at all."  Boulder has never acted to remove the offending signs and has not taken any action on this issue since 1999.  Although Plaintiffs argue that they are "entitled to a ruling" and that they are in "legal limbo, not knowing whether their signs have been grandfathered in or may be torn down at any time,"[258] whether the signs have been grandfathered in is an abstract disagreement in which this court is unwilling to get entangled.  Because many uncertain facts remain to be played out before these allegations can be considered a "case or controversy," this court finds that Plaintiffs have not presented a "clean cut and concrete" issue appropriate for adjudication. Further, under the second prong, the sign ordinance claims do not create a direct and immediate dilemma for the parties — being in "legal limbo" is not a sufficient hardship to warrant judicial consideration.

### G.  Town Records and Hours of Operation

#### 1.  Procedural Due Process

Boulder has not violated Plaintiffs' procedural due process rights.  The court looks to three factors when evaluating due process: "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest though the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the

---

[257] *Id.* (quoting New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1498-99 (10th Cir. 1995)).

[258] *Nielson*, 376 F.3d at 1237.

government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirement would entail."[259]

In the present case, this court must weigh the public benefit of having regular town hours of operation against the harm of forcing a small town to follow judicial guidelines (developed by a remote federal judge) for how it should operate.  Because Plaintiffs only suffered a delay in obtaining one map of the town, which Plaintiffs did eventually obtain, and because the town does keep regular hours at the post office, where the Town Clerk can be reached, this court finds that the burden to Boulder outweighs the private interest in forcing the Town Clerk to keep an alternative, mandatory schedule.

### 2. Substantive Due Process

Substantive due process protects citizens' fundamental rights from arbitrary governmental action.[260]  To violate the protections of substantive due process, the government, through arbitrary, "conscience shocking" action, must deprive a plaintiff of a protectable property interest."[261]  In this case, however, a mere delay in obtaining one map and irregular Town Clerk office hours do not shock the judicial conscience.

### H.  Land-Use Ordinances

Plaintiffs' claims regarding the LUO of March 2000 are moot.  "The touchstone of the mootness inquiry is whether the controversy continues to touch the legal relations of the parties

---

[259] *Wilkinson v. Austin*, 545 U.S. 209, 224-25 (2005) (citing *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976)).

[260] *See Hyde Park*, 226 F.3d at 1210.

[261] *See Perez*, 432 F.3d at 1166.

having adverse legal interest in the outcome of the case."[262]  In Plaintiffs' prior state case, the Utah Court of Appeals held that the map accompanying Ordinance 39 did not accurately reflect the town's zoning ordinance, thus invalidating the text of Ordinance 39 and mooting Plaintiffs' related LUO claims.  Although Plaintiffs now attempt to narrowly interpret the scope of this decision, this court finds that a plain reading of that opinion indicates that the Utah Court of Appeals invalidated Ordinance 39 as a whole.  Accordingly, like Plaintiffs' prior Ordinance 39 claims, which were moot because the Utah Court of Appeals declared Ordinance 39 invalid, Plaintiffs' current Ordinance 39 claims are also moot.

### I.  BEC

#### 1.  July 14, 1999 Building Permit

Ms. Mitchell's claims regarding the July 14, 1999 building permit fail under takings, due-process, and substantive-due-process analyses.

##### a.  Takings

Ms. Mitchell claims that she has been denied enjoyment of her property.  As stated above, a takings claim may result from "regulations that deny a landowner 'all economically beneficial or productive use of land.'"[263]  However, Ms. Mitchell — who concedes that she can access her property through B Street and does not need access through A Street — has not been denied all or even a significant portion of the beneficial use of her land.  Therefore, she has not suffered a compensable taking.

---

[262] *Wirsching v. Colorado*, 360 F.3d 1191, 1196 (10th Cir. 2004).

[263] *Clajon Prod. Corp. v. Petera*, 854 F. Supp. 843, 851 (D. Wyo. 1994) (quoting *Lucas*, 505 U.S. at 1015)).

### b. Procedural Due Process

In addition, Boulder has not violated Plaintiffs' procedural due process rights. A due process violation must arise from a "legitimate claim or entitlement" to the property.[264] This claim or entitlement does not arise from the Constitution, but must come from an independent source of law.[265] Here, Ms. Mitchell has presented no evidence to support any protectable property interest in A Street. Accordingly, this court must grant summary judgment because she cannot bear this burden of proof at trial.[266]

### c. Substantive Due Process

To violate a citizen's substantive due process rights, governmental action must "shock the conscience of federal judges."[267] In determining whether conduct is conscience-shocking, the Tenth Circuit weighs: "(1) the need for restraint in defining the scope of substantive due process claims; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting public safety."[268] Here, Boulder granted a building license from an approximate drawing which resulted in the partial obstruction of a road that Ms. Mitchell did not need to develop her property. This court finds these actions do not shock the judicial conscience and chooses not to extend § 1983 to state tort law.

### 2. February 2001 Business Licenses

---

[264] *Olech*, 528 U.S. at 564.

[265] *Dickeson*, 844 F.2d at 1437.

[266] *See Celotex*, 477 U.S. at 322.

[267] *Perez*, 432 F.3d at 1166.

[268] *Highland Dev., Inc. v. Duchesne County*, No. 203-CV-750 TC, 2007 WL 702237, at *27 (D. Utah Mar. 2, 2007) (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1184 (10th Cir. 2002)).

Plaintiffs' claims regarding the February 2001 Business Licenses also fail.  The court must grant summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[269]  Although Plaintiffs claim that Boulder encouraged other businesses to apply for licenses before the town passed a temporary land-use ordinance, this court must grant summary judgment because Plaintiffs fail to produce any potentially admissible evidence to support their claim and admit that they have no personal knowledge that any official from Boulder contacted these other businesses.

## CONCLUSION

In sum, because Plaintiffs fail to present any genuine issue as to any material fact, this court finds that Boulder is entitled to a judgment as a matter of law.  Ms. Mitchell's equitable relief claim regarding the Brooks Subdivision is moot, and Mr. Hatch's subdivision claims are precluded by his 1996 federal action.  At the same time, all of Plaintiffs' claims fail variously on statute of limitations, § 1983, and constitutional grounds.

Accordingly, this court hereby GRANTS Boulder's second motion for summary judgment [#87].

DATED this 9th day of October, 2007.

---

[269] *Celotex*, 477 U.S. at 322.

BY THE COURT:

Paul G. Cassell
United States District Judge